UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KATHY PERKINS | CIVIL ACTION |
| VERSUS | NO. 17-6689 |
| PEL HUGHES PRINTING, LLC ET AL. | SECTION A(4) |

## ORDER AND REASONS

Before the Court is a **Motion for Reconsideration (Rec. Doc. 66)** filed by Defendants Pel Hughes Printing, LLC and John Victor Hughes (hereinafter collectively referred to as "Defendants"). The Motion, set for submission on January 9, 2019, is before the Court on the briefs without oral argument. The Court has also received and reviewed Defendants' reply (Rec. Doc. 70) and Plaintiff's response (Rec. Doc. 71). Having considered the motion and memoranda of counsel, the record, and the applicable law, the Court finds that the **Motion for Reconsideration (Rec. Doc. 66)** is **GRANTED**.

**I.	Background**

Kathy Perkins worked for Pel Hughes Printing, LLC ("PHP") as a Human Resource Administrator. (Rec. Doc. 1, Exhibit A ¶ 5). On December 30, 2015, Perkins was admitted into Ochsner Hospital's Outpatient Behavioral Mental Unit Program due to alleged verbal abuse by John Victor Hughes, president of PHP. (*Id*, ¶¶ 9-12). After being diagnosed with stress, depression, and anxiety, Perkins remained in the hospital for two weeks. (*Id*., ¶ 12). While this leave was covered by the Family Medical Leave Act ("FMLA"), Hughes allegedly called Perkins' disabled daughter, Aubrey Pitre, and told her that, "Unless [Perkins] comes back to work soon, I'll have to let her go." (*Id*. ¶¶ 13-14). Perkins asserts that she returned to work against her physician's advice on January 18, 2016, out of fear of termination. (*Id.*, ¶ 16).

Defendants assert that on January 18, 2016, Hughes' wife had a conversation with Perkins which resulted in an "agreement" that PHP would terminate Perkins' employment after ninety days. (Rec. Doc. 25-5, p. 2). On April 4, 2016, Perkins took a scheduled day off to receive an epidural. (Rec. Doc. 1, Exhibit A ¶ 21). The next day, Perkins experienced a mental breakdown and was admitted to Ochsner Hospital for suicidal ideations. (*Id.*). Perkins remained hospitalized until April 13, 2016. PHP terminated Perkins' employment on May 2, 2016. (*Id.*, ¶¶ 21, 26).

Perkins filed suit alleging that Defendants violated the FMLA regarding the leave she took in January 2016 and that Defendants intentionally inflicted emotional distress. (*Id.* ¶¶ 14, 32). Defendants filed a Motion for Summary Judgment on all of Plaintiff's claims. (Rec. Doc. 25). Plaintiff filed an opposition to the motion (Rec. Doc. 61) and Defendants replied (Rec. Doc. 64). On December 4, 2018, this Court granted summary judgment in part as to Plaintiff's claims under the FMLA and denied summary judgment in part as to Plaintiff's claim for intentional infliction of emotional distress ("IIED"). (Rec. Doc. 65). Defendants now move this Court to reconsider the judgment regarding the denial of summary judgment on Plaintiff's claim for IIED.

**II.     Legal Standard**

The Federal Rules of Civil Procedure do not recognize a motion for reconsideration. *Bass v. United States Dep't of Agric.*, 211 F.3d 959, 962 (5th Cir. 2000). Nevertheless, the Fifth Circuit has treated a motion for reconsideration as a motion to alter or amend judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure when filed twenty-eight days after entry of the judgment from which relief is being sought. *Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n.10 (5th Cir. 1998); see also Fed. R. Civ. P. 59(e). A Rule 59(e) motion may be granted on four grounds: "(1) to correct manifest errors of law or fact upon which judgment is based, (2)

the availability of new evidence, (3) the need to prevent manifest injustice, or (4) an intervening change in controlling law." *Lines v. Fairfield Ins. Co*., No. 08–1045, 2010 WL 4338636, at *1 (E.D. La. Oct. 21, 2010) (citing *Peterson v. Cigna Group Ins*., No. 99–2112, 2002 WL 1268404, at *2 (E.D. La. June 5, 2002)). "The Court enjoys considerable discretion in granting or denying such a motion." *Gabarick v. Laurin Mar*. (America) Inc., No. 08–4007, 2010 WL 5437391, at *5 (E.D. La. Dec. 23, 2010) (citing *Boyd's Bit Serv., Inc. v. Specialty Rental Tool & Supply, Inc.*, 332 F.Supp.2d 938, 939 (W.D. La 2004)). The Fifth Circuit has held that a Rule 59(e) motion is not the proper vehicle for "rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet v. HydroChem Inc.,* 367 F.3d 473, 479 (5th Cir. April 2004).

**III. Discussion**

In its Order and Reasons (Rec. Doc. 65), the Court found that Plaintiff's opposition to Defendant's Motion for Summary Judgment was based primarily on her self-serving affidavit. Thus, the Court ordered Perkins to submit to a deposition within the following forty-five days. (Rec. Doc. 65, p. 6). In the instant motion, Defendants assert that Perkins was deposed prior to submission of her opposition, and she is still unable to present evidence in support of her claim for IIED. (Rec. Doc. 66, p. 1). Upon the Court's request, Defendants' counsel provided the Court with a copy of Perkins' entire deposition. Considering the new evidence, the Court now takes under consideration the Motion for Summary Judgment (Rec. Doc. 25) regarding Perkins' claim for IIED.

**A. Summary Judgment**

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the

light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 248). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (citing Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986)). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir.1993)).

## B. Intentional Infliction of Emotional Distress

In *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991), the Louisiana Supreme Court established the three elements necessary for a plaintiff to recover for IIED: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. For the conduct to be "extreme and outrageous," the conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *White,* 585 So.2d at 1209.

"Recognition of a cause of action for IIED in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time." *Id*. at 1210. In cases involving an employment relationship, Louisiana courts have held that, "a plaintiff's status as an employee may entitle him to a greater degree of protection from insult and outrage by a supervisor with authority over him than if he were a stranger." *Id.* The determination of a pattern of harassment "has been characterized as a sliding scale approach under which even relatively 'mild' harassment may become tortious if continued over a substantial time period." *Deus v. Allstate Ins. Co.,* 15 F.3d 506, 515 (5th Cir. 1994). (citing *Bustamento v. Tucker*, 607 So.2d 532, 538 (La.1992)). Through a pattern of harassment, minor isolated acts may create a "hostile work environment" resulting in outrageous conduct. *Id.* Louisiana jurisprudence establishes that "hostile environment claims have limited the tort's reach to harassment falling outside the standard friction arising from an employment relationship and infringing on issues unrelated to employment and protected by statutory and constitutional rights." *Id.* at 516. Such examples include sexual harassment, threats of physical violence, and racial discrimination. *Id*.

The Louisiana Supreme Court has held that in cases where the plaintiff is particularly susceptible to emotional distress, the defendant's knowledge of that particular susceptibility is a factor courts should consider. *White,* 585 So.2d at 1210. "Unless the actor has knowledge of the other's particular susceptibility to emotional distress, the actor's conduct should be judged in the light of the effect such conduct would ordinarily have on a person of ordinary sensibilities." *Id.* Louisiana law codifies the "vulnerable victim" category of claims for IIED in the Restatement (Second) of Torts § 46 comment F which states:

> The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough.

### C. Analysis

In her sworn declaration, Perkins stated that Hughes repeatedly subjected her to a "pattern of harassment over a substantial period of time." (Rec. Doc. 61, Exhibit A p. 2). She stated that he would yell at her and call her names. (*Id.*). He would also make derogatory comments about women, tease her about her need to take medication, and threaten to fire her on a daily basis. (*Id.,* Exhibit A p. 5).

Defendants argue that pursuant to the Louisiana jurisprudence, it is clear that the conduct alleged by Perkins does not give rise to the extreme and outrageous conduct necessary for Perkins' IIED claim. (Rec. Doc. 25-5, p. 7). Perkins' allegations of derogatory comments, threats of employment termination, and criticism of employee work performance unequivocally do not constitute extreme and outrageous conduct. (*Id.*). Defendants also argue that Perkins fails to produce evidence corroborating her allegations of misconduct and calculated intent. (*Id*. at 9). These allegations made by Perkins are contrary to Hughes' statements in his deposition. Defendants assert that Hughes never yelled at his employees and never made a comment derogatory towards women. (Rec. Doc. 62-3, Exhibit A pp. 3-4).

Perkins also declared in a sworn statement that Defendants had prior knowledge that she suffered with depression, anxiety, and bipolar disorder as she had disclosed her medical condition to Defendants when she was first employed. (Rec. Doc. 61, p. 11). She asserted that

she clearly exhibited her maladies through crying spells and anxiety. (*Id*). Defendants countered by citing Hughes' deposition to state that he was unaware that Perkins was diagnosed with bipolar disorder and clinical depression including that he did not know her December 2015 hospitalization was related to those conditions. (Rec. Doc. 62, p. 5).

Upon the Court's request, Defendants' counsel provided the Court with a copy of Perkins' entire deposition. When asked whether she liked Hughes, Perkins responded that she didn't like him because he didn't believe in God and that, "He screamed and yelled at me a lot." (Deposition, p. 116). Perkins testified that most of Hughes' yelling related to a co-worker who had a stroke. Hughes would yell at her about not filling out particular forms (*Id.* at 192). Perkins was given instructions not to talk to the co-worker's daughter or fill out the forms because there was an on-going dispute as to the type of benefits to which the co-worker was entitled. (*Id.* at 207-210). The Court notes that Louisiana jurisprudence generally limits extreme and outrageous conduct to issues unrelated to employment.

Perkins testified that Hughes would say "silly" things that were "maybe not funny" but were "maybe hurtful." (Deposition, p. 204). In order to better grasp the severity of Hughes' conduct, counsel for Defendants asked a series of questions regarding specific allegations set forth in the state court petition. The allegation that, "Hughes would randomly approach Ms. Perkins and tell her that he should have never allowed her to work for him," occurred more than once but the occasions were far apart in time. She couldn't recall if this occurred years apart. (*Id.* at 146). When asked about the allegation that Hughes would say "Women are stupid and should be at home cleaning the house and cooking," Perkins said that this type of remark would occur more frequently, about once every two weeks. (*Id.* at 148). She testified that this occurred in front of other employees, but she couldn't specify who. (*Id.* at 154). With regard to Perkins'

allegation that, "Hughes would tease Ms. Perkins about her need to take medication," Perkins stated that she thought he was having problems because this occurred during a time when he was living at work. (*Id*. at 169). She stated she thinks he was partially reaching out for help. (*Id.*). When asked to identify a time he "belittled" her about taking medication she said he did belittle her, but she couldn't recall a certain time. (*Id.* at 191).

A source of the harassment Perkins identified in her deposition included that Hughes bullied her about the loss of her house. Perkins specified that, "He bullied me about the loss of my house saying, 'What happens when you get your house foreclosed? What does the bank do? I wouldn't know because my house has not been foreclosed.'" (Deposition, p. 188). When asked how frequently this occurred, Perkins stated that about once a week Hughes would call her into his office to see how things were going and then make a "joke." (*Id.*).

Counsel asked Perkins to discuss the causes of mental anguish leading up to her FMLA approved leave. Perkins stated that the stress began when the co-employee suffered from a stroke while at work. (Deposition, p. 76). It became stressful to do her job because she worked in Human Resources and Hughes didn't want to process the paperwork related to the co-worker. (*Id.* at 77). The stress continued because her job functions changed due to an outsourcing of one of her tasks. (*Id.* at 79). Perkins also testified that she and a handful of other employees received pay decreases. (*Id.* at 82). The other factors for stressors of mental anguish included dealing with her mother, physical pain, and harassment. (*Id*. at 157).

Defense counsel questioned Perkins on whether she discussed Hughes' conduct with co-workers or reported the yelling to anyone. Perkins stated that co-employees heard the yelling and once she told Hughes' wife that he yelled at her, but she did not recall complaining to anyone else or report anything even though she worked in Human Resources. (Deposition, p. 121-123).

Despite all these alleged maladies of Hughes, Perkins stated that she wanted to return to Pel Hughes because she loved her job. (*Id*. at 113).

The Court concludes that even in a workplace environment, there exists no genuine issue of material fact as to whether Hughes' conduct was extreme and outrageous. IIED claims are for exceptional circumstances in which a pattern of harassing conduct "goes beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." According to Perkins' deposition, Hughes inappropriately yelled at Perkins and he made "hurtful" and "silly" remarks, but the Court declines to find that a reasonable jury could return a verdict for the non-moving party. Even if these assertions were true, this conduct which may be classified as crude, rough, and uncalled for does not give rise to a cause of action of repetitive harassment causing severe distress. The Court understands that Perkins had several stressors in her life; however, none of the Defendants' conduct gives rise to the extreme and outrageous conduct as required by Louisiana jurisprudence for IIED.

In so far as to what Hughes knew about her "medical issues" and the allegations of Perkins as a "vulnerable victim," Perkins said that he knew she was struggling with the passing of her father and the refinancing of her home. (*Id*. at 193). She stated that she told Hughes she had to refinance her house. She admitted that she attempted to elicit sympathy from Hughes because Hughes gave pay raises to people with "sad stories." (*Id*. at 82-84). The Court notes that Perkins asserts that, "He said he was going to do whatever he could to keep me on." (*Id.* at 197). Nevertheless, there appeared to be communication issues between what was said in person versus what was said in email and Perkins' failure to receive a formal offer and formally accept. (*Id.* at 198).

It is clear from the deposition that Hughes tried to help Perkins find another job at the company to help her with her financial situation. Counsel asked Perkins whether Hughes knew of her FMLA leave; she replied, "No." (*Id.* at 101). The Court declines to find that a reasonable jury could find that Hughes' had knowledge of a particular susceptibility to emotional distress such that his behavior was in fact extreme and outrageous.

## IV. CONCLUSION

Accordingly;

IT IS ORDERED that Defendants' **Motion for Reconsideration (Rec. Doc. 66)** is **GRANTED**. Defendants' **Motion for Summary Judgment (Rec. Doc. 25)** is **GRANTED** with respect to all of Plaintiff's claims including intentional infliction of emotional distress.

New Orleans, Louisiana, this 22nd day of January, 2019

JUDGE JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE